UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOAN SHELLEY, MICHELLE LOFTIS, SANDRA HOYOPATUBBI,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN JOAQUIN; SHERIFF STEVE MOORE, in his Official Capacity as Sheriff of San Joaquin County and STEVE MOORE, individually; Does 1 to 100,<br><br>Defendants. | No. 2:13-cv-00266-MCE-DB<br><br>**MEMORANDUM AND ORDER** |

Through this action, Plaintiff Joan Shelley[1] ("Plaintiff") seeks to recover damages from the County of San Joaquin ("Defendant" or "County"), on grounds that the County exhumed the body of Plaintiff's daughter, Jo Ann Hobson, in a careless and wrongful fashion. Plaintiff premises federal jurisdiction on alleged violations of the United States Constitution under 42 U.S.C. § 1983. Presently before the Court is Defendant's Motion for Summary Judgment brought on grounds that no genuine triable issues of fact exist

---

[1] While Plaintiff's surviving daughters, Michelle Loftis and Sandra Hoyopatubbi, were also originally named as Plaintiffs in this action, the parties filed a Notice of Settlement on July 20, 2016, indicating that a settlement had been reached as to any claims brought by Loftis and Hoyopatubbi. Therefore, this action proceeds only as to Plaintiff Shelley's claims.

1

with regard to its liability and that the County is accordingly entitled to judgment as a matter of law under Federal Rule of Civil Procedure 56.[2]

**BACKGROUND**

On or about August 28, 1985, sixteen-year-old Jo Ann Hobson disappeared; her mother, Plaintiff Joan Shelley, reported Ms. Hobson as missing approximately a week later. Def.'s Statement of Undisputed Facts ("SUF"), No. 4-5. Initial investigation efforts proved unavailing and Ms. Hobson's disappearance was ultimately transferred to the "cold case unit" of the San Joaquin County Sheriff's Office ("SJSO") despite suspicion that she had been a victim of the so-called "Speed Freak Killers," Loren Herzog and Wesley Shermantine. Mr. Herzog and Mr. Shermentine were suspected of having murdered as many as 25 different individuals, with the whereabouts of at least 20 victims remaining unknown. Dep. of Sergeant Michael Jones, 53:20-54:7.[3]

In 2012, SJSO Detective Chanda Bassett ("Bassett") received information suggesting that some of the unaccounted for bodies had been buried in an agricultural well on Flood Road in rural San Joaquin County. SUF at 7. When she contacted the property owner of the land on which the well at issue was situated, the owner told Bassett that the well, which was believed to be about 30 feet deep, had been plugged years before with garbage, tree stumps and dirt in order to prevent anyone from falling in and being injured. Id. at 8. The owner nonetheless gave his permission for the well to be searched.

The surface soil around the six-foot diameter well consisted of hard, compressed undisturbed clay known as "hard pan". Because of that soil composition and the fact

---

[2] All further references to "Rule" or "Rules are to the Federal Rules of Civil Procedure unless otherwise noted.

[3] Defendant County lodged with the Court electronic copies of all pertinent depositions taken in this matter. Unless otherwise specified, the Court's reference to deposition testimony in this Memorandum and Order refers to those lodged transcripts.

2

that heavy foreign material had been dumped into the well, County Public Works Supervisor Larry Waddle recommended that an excavator be used to commence digging. Id. at 22. On February 8, 2012, an excavator with a seventeen foot "short reach" arm was delivered to the site. Because of the potential danger of excavating such a deep well, federal safety regulations required that a "competent person" capable of "identifying existing and predictable hazards in the surroundings" be present and ready to "take prompt corrective action to eliminate" such hazards. 29 C.F.R. § 1926.32(f); SUF at 39. The County's Department of Public Works equipment operator David Drum was designated as the appropriate "competent person and was responsible that activities on the site be conducted safely and in compliance with [federal] standards." Id. at 41-42. Mr. Drum also operated the excavator.

Consistent with the property owner's representations, initial excavation on February 8, 2012, removed chunks of concrete, tree stumps, and hard soil up to a depth of approximately 10 feet. Id. at 48. On the following day, Bassett advised Plaintiff's daughter, Michelle Loftis, that the well was being excavated for human remains. Bassett agreed to drive Plaintiff and her daughter to the excavation site. In the meantime, the SJSO had blocked access to Flood Road in an attempt to prevent media and any unauthorized personnel from coming within about a mile of the well. While Bassett would not permit Plaintiff and Loftis to leave the vehicle, it is undisputed that she explained to them that while initial digging to remove dirt and debris would be by excavator, when and if human remains were discovered that excavation would stop. Id. at 57. Bassett admits that she indicated that recovery efforts would then change to digging by hand. Bassett Dep., 48:24-49:3. According to Plaintiff, Bassett's assurances in that regard were made in response to her own concern, upon seeing the steel claws of the excavator, "that my daughter was going to be dug up and chopped into pieces." Shelley Decl., ¶ 4; Shelley Dep., 58:9-24. Plaintiff claims that while she initially became "hysterical" at this thought, she was calmed by Bassett's reassurance that as soon as bones were discovered, excavator use would stop. Shelley Dep. 58:25-59:8. Plaintiff

3

reiterated that she didn't want a backhoe to remove her daughter's remains, stating that "I don't want them to tear her up, I don't want them to dig her out like that." Shelley Dep., 61:25-62:3; Loftis Dep., 47:23-25.

Excavation at the site, which had apparently stopped while Plaintiff and Ms. Loftis were on the scene, resumed once they left. Digging that day uncovered an engine block, animal carcasses, washing machine parts, railroad ties, glass and garbage but no human remains. SUF at 62. The digging was stopped at a depth of approximately 15 feet because the "short reach" excavator being used could not extend any deeper. A 28-foot "standard reach" arm excavator capable of reaching a 24-foot depth was then brought in. Id. at 63-64. Detective Bassett and Mr. Drum then agreed to dig a descending ramp into the well's center line so as to reach deeper into the well from the bottom of the ramp. Id. at 66-67. Bassett and Drum initially believed that this would allow County personnel to walk down into the ramp up to a depth of 30 feet, and dig any human remains discovered out by hand. Id. at 69. After consulting the regulations, however, Drum determined that the ramp could not go deeper than 25 feet due to the potential for a cave-in. Id. at 70.

Once the contemplated ramp was completed, a "long reach" excavator was brought in on February 10 and removed more dirt and debris from the well up to a depth of approximately 35 feet. Id. at 74. No remains were discovered and the next day, digging with the excavator continued from the bottom of the ramp. At approximately 2:00 p.m. on the afternoon of February 11, 2012, a human bone was brought to the surface from a depth estimated by the County to be around 50 feet. Id. at 77.[4] At that point, consistent with the representations that Detective Bassett made to Plaintiff, excavation appears to have ceased for some time, only to resume at the direction of Sergeant Jones on grounds that the dirt was too hard to dig by hand. Id. at 269; Jones Dep., 51:1-3. While there was discussion between Jones, Bassett and Drum about

---

[4] The depth at which remains were discovered appears to be the subject of some dispute, however. Deposition testimony suggests that it may have been as little as 35 feet. See, e.g., Jones Dep., 50:6-8.

1 whether the excavator could widen the well on all four sides to a depth that would allow

2 workers to enter, this would have required the destruction of surrounding encumbrances,

3 including a driveway, within at least 100 feet of the well due to OSHA "benching" and

4 "slope" requirements. SUF at 100-01. There is no evidence that other alternatives

5 permitting hand digging in a more confined space were considered. Jones admitted that

6 he did not consult with anyone in this regard before he issued the order to resume use of

7 the excavator after human remains were discovered. Jones Dep., 52:5-8.

At this point, California Department of Justice criminologists who had previously been contacted by the SJSO, arrived at the scene with sifting screens, shovels and brushes, and the excavator continued to bring scoops of soil to the surface. Id. at 80.[5] By the time the criminologists arrived, there were 12 piles of dirt, 3 of which contained human bones and other effects. Terra Dep., 37:4-5; 59:7-23. Moreover, due to the high profile of the case and intense media interest, both television and print media outlets had stationed themselves at the one-mile barricade, including most major television stations from both the Sacramento and San Francisco areas, television stations from Japan and Australia, as well as reporters from the Stockton Record, the Huffington Post, the New York Times, Reuters, CNN, the Associated Press and MSNBC. SUF at 92. Several media outlets went so far as to utilize helicopters and fixed-wing airplanes to fly over the site and take video utilizing high-powered lenses. Id. at 93, 114, 117.

This barrage of media attention continued over the following three days, February 12 through 14, as recovery efforts continued. Id. Excavation nonetheless continued, and a total of 56 piles of soil were brought to the surface. Id. at 139. After larger evidentiary items, including remains and personal effects, were isolated from large chunks of dirt, concrete and debris, the remaining dirt was sifted through screens to collect smaller fragmentary pieces. Id. at 84-85. Due to intense public interest, videos of the recovery efforts (apparently taken by airplanes flying overhead), were broadcast on

---

[5] According to the County, it was common practice for the SJSO to call the DOJ for assistance with forensic matter (SUF at 8), and Bassett had requested assistance accordingly.

local television outlets. The County claims it neither authorized nor condoned the media's video surveillance in this regard. Indeed, in an attempt to satisfy public interest in the recovery effort, the County invited a reporter, video camera operator and still photographer to the well site for a limited period of fifteen minutes during which time the excavator was not operating and no material was being brought to the surface. Id. at 119-125.

During one of the television broadcasts that aired over a period of several days, Shelley alleges to have seen an excavator bringing clothing, as well as what appeared to be a human bone sticking out of a jacket she believed belonged to her daughter, to the surface. Shelley Dep., 164:1-165:20, 127: 1-17.[6] Plaintiff claims this caused her severe emotional distress, stating as follows:

> What I saw destroyed me that day, mentally and physically, and for months after. I saw the large earth moving equipment and bucket pulling out and chewing up clothing with bones sticking out of the sleeves, and then being dumped in large piles of dirt like garbage. I thought it was my daughter being destroyed all over again. I could not imagine this, I felt like I was going to lose my mind, and I was not able to proceed with my life or work for some time.

Shelley Decl., § 5.

At her deposition, Plaintiff reiterated that seeing the experience made her feel like "my child was murdered all over again." Shelley Dep., 123:4-9. Michelle Loftis, who also saw the broadcasts, stated the she saw bones hanging from an excavation bucket, as well as a striped sock similar to ones worn by Jo Ann Hobson with a leg or foot bone extending from the sock. Loftis Dep., 97:22-98:11; 99:9-12. Even Assistant Sheriff Ruben Orozco recalled seeing news footage showing a jacket with bones in it. Orozco Dep., 23:17-21.

The County discounts Plaintiff's claim that their recovery methods "chewed up, pulverized, destroyed, crushed and commingled [Jo Ann Hobson's] bones" with those of

---

[6] The County claims that subsequent identification of the bone revealed it was not in fact Jo Ann Hobson's. SUF at 164.

other murder victims. FAC, ¶ 11. Forensic anthropologist Dr. Elizabeth Miller, an expert retained by the County, opined that the remains, particularly given their long fall from the surface to the bottom of the well, would have been commingled and fragmented regardless of technique due to time, moisture, and pressure from soil and debris. Miller Decl., ¶¶ 9-12

According to the County, that conclusion is bolstered by the condition of the fragmentary skeletal remains ultimately recovered. Michelle Terra, a California Department of Justice criminalist involved in sifting through the bone fragments, described them as dirty on all sides, indicating that they had broken apart prior to excavation. Id. at 141. Moreover, Ms. Terra stated the bones themselves were "very brittle . . . [they] would literally just crumble in my fingers." Id. at 143, citing Terra Dep., 66:17-67:3.

According to the County, digging reached the bottom of the well on February 15, 2012. After all 56 piles brought to the surface were documented, sorted and sifted, a total of 1,700 human bone fragments were identified. Id. at 140. The County maintains that the DOJ criminalists involved in the recovery, Ms. Terra and her supervisor, Kathleen Ciula, at no time objected to the excavator being used in recovery efforts. Id. at 145, 147.

In addition, Jill Spriggs, the Department of Justice Chief of Forensic Services during the recovery, argued that given the debris that plugged the well, which included washers, dryers and car parts, the bones could not have been recovered without a backhoe, and it was that debris that commingled the remains rather than use of a backhoe. Id. at 154.

The propriety of using an excavator under the circumstances, however, is by no means undisputed. While Dr. Miller opined that hand excavation was neither practical or safe, and that the excavation was conducted in accordance with best practices (see id. at 206, 207), Plaintiff's expert, Dr. Eric Bartelink, "completely disagrees" with both of those assessments, and opines that there were numerous other feasible and more

appropriate ways both to have excavated the well and to have carefully removed the remains found therein. Id. at 272, see also Bartelink Decl., ¶¶ 4F, 4G (finding it inconceivable that any best practice in forensic anthropology would countenance the mass digging of skeletal remains from a burial site). According to Dr. Bartelink, a forensic anthropologist at California State University, Chico, his own analysis of Jo Ann Hobson's bones showed that some were likely broken apart during the excavation. Bartelink Dep., 50:22-51:1. He believed that using an excavator was unnecessarily destructive and ignored other ways or means to manage the recovery. SUF at 272. Additionally, Dr. Bartelink pointed out that "pictures from the dig showed little or minimal commingling or fragmentation until after the skeletal remains were crushed and dug out of the ground with large dirt moving equipment." Bartelink Decl., ¶ 4C, 4:1-4. Finally, even the County's own Chief Medical Examiner, Dr. Bennet Omalu, concluded the skeletal remains were not recovered in accordance with the applicable standard of practice. Omalu Dep., Ex. N to the Decl. of Jeffrey Rinek, 30:12-31:8.

To that same end, another expert identified by the County, Daniel O'Connell, admitted that the excavated well could have been shored through use of casing or a "eurorail" system technique, albeit at higher cost.[7] Id. at 230. According to O'Connell, casing would have cost some $192,800.00, with the eurorail technique running approximately $315,394.96, in construction labor and equipment alone. Id. at 231-232. Aside from their cost, these techniques, in conjunction with hand digging, would have taken between 40-45 days to complete, as opposed to the approximate one week period during which the well was excavated with a backhoe, and would thus have required increased personnel costs attendant to that extra period. Id. at 234. In discounting either casing or eurorail techniques, the County basically contends that it was costly, too time-consuming, or both to have conducted the operation differently. There is no

///

---

[7] Plaintiff suggests that the County actually spent some $177,000 to recover remains from the well in question, although this figure does not appear to be corroborated. At any rate, it appears safe to conclude that using an excavator was cheaper than either casing or using a eurorail technique.

8

evidence, however, that Sheriff Moore or anyone at the SJSO looked into these alternatives in order to recover the victims' bodies from the well.

Once the recovery operation ended, the remains uncovered were sent to Dr. Sari Miller-Antonio, an independent anthropologist (and a professor and associate dean at California State University, Stanislaus) hired on a contract basis by the Department of Justice, for evaluation. Id. at 34, 168-170. Dr. Miller-Antonio spent some six months evaluating and separating the bones. Id. at 175. Based on the consistency of the bone thickness, their overall size, and differences in condition, the bone fragments were assigned to four different individuals: Jo Ann Hobson, Kimberly Billy, and an unidentified mother and her unborn fetus. Id. at 173, 177. Once Dr. Miller-Antonio's assessment had been completed, Jo Ann Hobson's bones were returned to her family on or about August 15, 2012. Id. at 183. According to Dr Miller Antonio, the way in which the bones were recovered did not prevent DNA analysis or identification. Id. at 174.

Plaintiff then proceeded to have her daughter's skeletal remains examined yet again, this time by Dr. Bartelink. Dr. Bartelink spent another 5 months performing his own independent forensic evaluation on the "hundreds" of fragments involved. Id. at 186. He definitively identified two bones that did not belong to Jo Ann Hobson: a fetal bone and a bone belonging to Kimberly Billy. Id. at 187. Moreover, the parties "generally agree" that bone fragments assigned to the unidentified female likely contained some bones belonging to Jo Ann Hobson. Id. at 190.

Plaintiff filed the instant lawsuit on February 11, 2013 alleging that the County's conduct in exhuming her daughter's remains violated both procedural and substantive due process rights guaranteed by the United States Constitution. At the present time, the matter proceeds only as to Plaintiff's substantive due process claim, brought under the auspices of 42 U.S.C. § 1983, against the County. While Plaintiff previously asserted a procedural due process claim as well, that claim has already been dismissed. ECF No. 32.

///

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

///

///

///

**ANALYSIS**

**A.    Availability of Procedural Due Process**

The Due Process Clause includes a substantive component that "bar[s] certain [arbitrary wrongful] government actions regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331 (1986). The substantive due process doctrine is rooted in the notion that some rights are so fundamental that no amount of process justifies governmental interference, County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998).

Although the Supreme Court has been reluctant to expand the lists of rights protected by substantive due process, it has recognized that the doctrine extends to a "right or privacy" limited to "a person's most basic decisions about family and parenthood . . . as well as bodily integrity." Planned Parenthood v. Casey, 505 U.S. 833, 849 (1992); California v. F.C.C., 75 F.3d 1350, 1361 (9th Cir. 1996).

In Marsh v. County of San Diego, 680 F.3d 1148, 1154 (9th Cir. 2012), the Ninth Circuit recognized a parent's "right of privacy" to "control a deceased child's remains," and found that said right "flow[ed] from the well-established substantive due process right to family integrity." Marsh, a case of first impression,[8] was decided in the context of a governmental employee's unjustified release of a young child's autopsy photos in the media, and determined that the child's parent in that case had a substantive due process right to control the release of such photos. Id. at 1155. Finding that the right of family members to direct and control disposition of the body of a deceased "ingrained in our traditions," the court recognized a substantive due process right in that context.

The County, while recognizing that the respectful treatment of the dead is a deeply rooted cultural tradition, nonetheless urges the Court to limit Marsh's holding to its particular facts. The language of the Marsh decision, however, belies any such

---

[8] Marsh specifically noted that no court had yet held that substantive due process rights attached to the dissemination or control of images of a dead family member. Id. at 1153.

12

limited interpretation. In addition to applying substantive due process to the public display of death images, the case further applied the same rationale to "[m]utilation of a deceased family member's body" or "desecration of the burial site" finding that in each instance such conduct is "likely to cause the family profound grief and therefore 'shocks the conscience' and 'offend[s] the community's sense of fair play and decency.'" Id. at 1155, citing Rochin v. California, 342 U.S. 165, 172-73 (1952); see also National Archives and Records Adm., v. Favish, 541 U.S. 157 (2004) (finding that "th[e] well established cultural tradition acknowledging a family's control over the body and death images of the deceased has long been recognized as common law"). Citing "precisely the same reasons," Marsh concludes that these rights are "also protected by substantive due process." 680 F.3d at 1154.

Drawing all inferences in favor of the opposing party, as the Court must do on summary judgment, it appears clear that the facts present here arguably implicate both the "mutilation" of Jo Ann Hobson's body and the "desecration" of her burial site in the abandoned well containing her remains. Consequently, under the rationale of Marsh, this Court cannot rule as a matter of law that Plaintiff's substantive due process rights were not violated under the circumstances of this case.

**B.  Whether the County's Conduct Here Implicates Due Process**

In order to implicate substantive due process concerns, which as indicated above the Court finds to exist under the circumstances of this particular case, the alleged conduct must "shock the conscience" and "offend the community's sense of fair play and decency." Rochin v. California, 342 U.S. at 172-73. If the facts are undisputed, this determination can be decided as an issue of law. See Preschooler II v. Clark County School Bd. of Trustees, 479 F.3d 1175, 1181 n.5 (9th Cir. 2007).

It must first be noted that the conduct involved here may well implicate substantive due process based on its very nature alone. As discussed above, Marsh appears to recognize that in instances involving the mutilation of a deceased family member's body, or desecration of the family member's gravesite, conduct that "shocks

13

the conscience" or offends the community's sense of decency, is necessarily inferred. Marsh, 680 F.3d at 1155. Nonetheless, even if the Court looks at the kind of qualifying conduct as a general matter, the type of conduct most likely to rise to the "conscience-shocking level" is conduct "intended to injure in some way unjustifiable by any government interest." County of Sacramento v. Lewis, 523 U.S. at 849. The standard is met "by conduct that either consciously or through complete indifference disregards the risk of an unjustified deprivation of liberty." Tatum v. Moody, 768 F.3d 806, 820-21 (9th Cir. 2014).

According to the County, no conduct coming close to this standard has been identified. The Court disagrees. The County elected to use large earth moving equipment to excavate a well they knew was likely to contain human remains, including those of Plaintiff's daughter, Jo Ann Hobson. While initially using an excavator may well have been reasonable, the Court cannot say as a matter of law that the County's decision to continue using the backhoe was reasonable once digging had proceeded to a level where human remains were discovered.

When Detective Bassett initially took Plaintiff to the probable grave site, Plaintiff allegedly became hysterical when she saw the backhoe and feared that her daughter's remains would be "torn up" and "chopped into pieces." In order to calm Plaintiff, Bassett reassured her that once remains were uncovered the use of a backhoe would stop and bones would be removed through a hand dig. Then, drawing all inferences in favor of the evidence produced by Plaintiff, the County allegedly determined that it was too difficult, time-consuming, and expensive to proceed with hand digging, and there is no indication that Plaintiff was expressly informed of that change in strategy despite her repeated entreaties that an excavator not be used and the emotional distress Bassett had already observed in conjunction with Plaintiff's observation of the excavator. Instead, the County simply continued to use the excavator without even considering other options that may have been only slightly more expensive ($192,500 for casing, along with additional personnel costs as opposed to the $177,000 that Plaintiff alleges

the dig cost anyway). Any need to take advantage of the speed attendant to a mechanized dig (the excavation as performed only took about a week, and according to the evidence proceeded other options may have gone on for 30-45 days) would appear minimal given the fact that the remains had already been in the well for more than 25 years, thus mitigating against any emergency in recovering them.

Additionally, and again drawing all inferences in Plaintiff's behalf as the party opposing this motion, the County proceeded with machine excavation, bringing loads of dirt, debris and remains to the surface and dumping them on the ground, despite being aware of the intense media interest in the case and the fact that footage of the recovery operation was being taken by aircraft flying overhead. The County did not change its techniques to either conceal the piles being brought to the surface, or change the digging method altogether so that the results would not be exposed to plain view. This resulted in news broadcasts observed by Plaintiff showing body parts that she believed belonged to her daughter being dumped "like garbage." Plaintiff's declaration, as well as her deposition testimony, show that these images caused her severe emotional distress, which the County was on notice from Bassett's prior interaction with Plaintiff would be the result.

Viewed accordingly, the Court cannot rule out, as a matter of law, a finding that the County's conduct here "shocks the conscience." Consequently, the County is not entitled to summary judgment on that basis. While the County argues that the recovery of remains from the well was particularly problematic given the well's depth and because the circumstances of the dig were virtually unprecedented, those factors are, at best, factual determinations that must be weighed by the jury in deciding whether the manner in which the County proceeded here shocked the conscience. Whether the cost or time involved precluded other means of recovery also is a question of fact where other methods, like the casing or "eurorail" techniques, were available yet ignored by the County in proceeding with use of an excavator once human remains were discovered.
///

In addition, the fact that the County did not authorize or participate in video surveillance of the recovery efforts is unpersuasive where there are factual disputes about what the County could or should have done when confronted by those activities. The County neither stopped its chosen method of recovery once it became clear that this method allowed such surveillance, nor changed its technique to one which would have afforded the process to proceed more privately. In the end, a jury must decide whether the County's response in this regard was a reasonable one.

Consequently, the Court finds that Plaintiff has identified conduct which implicates behavior sufficiently conscience-shocking to survive summary judgment.[9]

### C. Monell Liability

As the County points out, Plaintiff's claim against it is based on a 42 U.S.C. § 1983 violation. A municipal entity like the county, however, is only liable under § 1983 if the constitutional injury was the result of a "custom, policy, or practice" pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Nonetheless, even a "single decision may satisfy Monell's municipal policy requirement" if that decision was "properly made by one of the [entity's] authorized decisionmakers; that is, by an official who 'possesses final authority to establish a municipal policy with respect to the challenged action.'" Gobel v. Maricopa County, 867 F.2d 1201, 1206-07 (9th Cir. 1989) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479-81 (1986).

According to the County, it can be liable only for such acts which the municipality has officially sanctioned or ordered through such an official. Pembaur, 475 U.S. at 480. A decision by such policymaking officials is not implicated by "the mere failure to investigate the basis of a subordinate's discretionary decision," since such a failure should not be considered "a delegation of policymaking authority." St. Louis v. Praprotnik, 485 U.S. 112, 130 (1988). Instead, as the Supreme Court recognizes, "the

---

[9] Because the Court finds that the recovery efforts alone are sufficient to implicate Plaintiff's substantive due process rights, it need not also determine whether the separation and identification of the remains also shocked the conscience, and it declines to do so. In addition, the related issue of whether Dr. Miller-Antonio, as a private forensic evaluator, acted "under color of law" in separating the remains need also not be considered.

purposes of § 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy." Id. at 130.

Because Sheriff Steve Moore is both the County Coroner and the Sheriff, by law he is obligated to investigate and take control of any dead body. Indeed the County expressly concedes that Moore "was the County official with 'final policymaking authority' in [the] area of criminal investigation and forensic recovery." Def.'s Mot., 34:3-4. It was therefore Sheriff Moore's legal duty to be made aware of the uncovering of human remains, and to decide how to further recover such remains. The County nonetheless points to testimony suggesting that because it was other County employees, like Bassett and Sergeant Jones, who issued direct orders on proceeding with the recovery, Sheriff Moore is necessarily absolved of any participation in the process. The County therefore claims that it bears no conceivable municipal liability under § 1983 in the absence of any decisions being made by its authorized decision maker, here Sheriff Moore.

Again, the Court finds that disputed issues of fact preclude it from deciding as a matter of law that Moore lacked the necessary involvement in the recovery effort. As Plaintiff points out, there is testimony suggesting that Moore's involvement was more than his absence at the crime scene might otherwise suggest. Even Moore testified that he "purposely stayed away from the site" simply because his physical presence would attract even more media attention. Moore Dep., 32:3-6. At the same time, however, he admits he was given ongoing updates as to the status of the investigation as it proceeded. Id. at 32:12-14. He also participated in a meeting to "go over the information and the investigation process" before actual recovery efforts even began. Id. at 27:3-8. In addition, despite being out-of-town when human remains were actually reached, Moore was advised by Assistant Sheriff Ruben Orozco of when that discovery occurred. Id. at 33:3-7.

The testimony of Assistant Sheriff Orozco also confirms that Moore was continually kept abreast of recovery efforts. According to Orozco, it was he, as opposed to Moore, who directly discussed with the site crew how human remains would be

17

recovered. Orozco Dep., Ex. W To Rinek Decl., 17:1-5. Orozco nonetheless testified that he, in turn, was in regular contact and reported to his immediate boss, Moore, as the excavation proceeded. Id. at 16:12-16. According to Orozco, Sheriff Moore, was kept apprised of the entire process as it unfolded. Id. at 19:23-25.

Thus, even if directives at the site were not specifically made by Moore, under these circumstances the Court cannot discount the possibility that he was involved behind the scenes in all pertinent developments and on that basis satisfied the "authorized decision maker" predicate of § 1983 liability. To the extent the implications of Moore's and Orozco's testimony are at odds with other testimony which the County argues minimizes any participation by Moore in the process, those disputes simply raise triable issues of fact. In sum, then, the scope and extent of Moore's involvement turns on factual determinations not amenable to decision on summary judgment.

**CONCLUSION**

For all the foregoing reasons, Defendant County of San Joaquin's Motion for Summary Judgment (ECF No. 72) is DENIED.

IT IS SO ORDERED.

Dated: October 11, 2017

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE